

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-21-00379-CV

———————————————————

HUTCHINSON INDUSTRIES, INC., Appellant

V.

DBL DESIGNS, LLC, Appellee

On Appeal from the 348th District Court
Tarrant County, Texas
Trial Court No. 348-299777-18

Before Kerr, Bassel, and Walker, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

Appellant Hutchinson Industries, Inc. successfully sued Appellee DBL Designs, LLC under the Lanham Act for trademark infringement and for unfair competition by "passing off." *See* 15 U.S.C.A. § 1125(a). The trial court awarded Hutchinson permanent injunctive relief, and based on the jury's verdict, awarded Hutchinson nearly $81,000 in profit-disgorgement damages on its trademark-infringement claim. But the trial court denied Hutchinson's request for attorney's fees under the Lanham Act, which allows a trial court to award the prevailing party reasonable fees in "exceptional cases." *Id.* § 1117(a).

Hutchinson has appealed, and in one issue, argues that the trial court erred by refusing to find that this case was an exceptional case because (1) DBL willfully violated multiple provisions of the Lanham Act; (2) Hutchinson's litigation position was unusually strong; and (3) DBL engaged in improper, abusive litigation conduct. Even though we might have ruled otherwise, we will affirm because the trial court acted within its broad discretion in denying Hutchinson's request to deem this case exceptional.

## I. The Lanham Act and Attorney's Fees

Because a trial court's decision whether to award attorney's fees under the Lanham Act is a federal-law issue that we rarely have the occasion to review, we begin with an overview of the applicable law and standard of review.

The Lanham Act allows a trial court to award reasonable attorney's fees to the prevailing party in exceptional cases.[1] *Id.* "[A]n exceptional case is one where (1) in considering both governing law and the facts of the case, the case stands out from others with respect to the substantive strength of a party's litigating position; or (2) the unsuccessful party has litigated the case in an 'unreasonable manner.'" *Baker v. DeShong*, 821 F.3d 620, 625 (5th Cir. 2016) (citing *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554, 134 S. Ct. 1749, 1756 (2014)) (adopting the *Octane Fitness* Patent Act exceptional-case standard for use in Lanham Act cases). A trial court determines the exceptional-case issue on a "case-by-case exercise of [its] discretion, considering the totality of the circumstances." *Id.* (quoting *Octane Fitness*, 572 U.S. at 554, 134 S. Ct. at 1756). A court may consider a nonexclusive list of factors, including "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Octane Fitness*, 572 U.S. at 554 n.6, 134 S. Ct. at 1756 n.6 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19, 114 S. Ct. 1023, 1033 n.19 (1994)). There is no precise rule or formula to determine

---

[1]It is undisputed that Hutchinson is the prevailing party. *See All. for Good Gov't v. Coal. for Better Gov't*, 919 F.3d 291, 295 n.16 (5th Cir. 2019) (recognizing that in the Lanham Act context, a prevailing party is "a party in whose favor judgment is rendered" or "one who has been awarded some relief by the court" (quoting *Kiva Kitchen & Bath Inc. v. Cap. Distrib., Inc.*, 319 F. App'x 316, 322 (5th Cir. 2009))).

whether to award fees, and a trial court should use its equitable discretion in light of these considerations. *Id.* at 554, 134 S. Ct. at 1756.

We review all aspects of a trial court's fee determination—including its conclusion on whether a case is exceptional—for an abuse of discretion.[2] *See Spectrum Ass'n Mgmt. of Tex., L.L.C. v. Lifetime HOA Mgmt. L.L.C.*, 5 F.4th 560, 564 (5th Cir. 2021) (citing *All. for Good Gov't*, 919 F.3d at 295). A trial court abuses its discretion if it acts without reference to any guiding rules or principles—that is, if its act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). We cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620.

---

[2]In 2010, this court reviewed for clear error a trial court's determination that a prevailing party under the Lanham Act had established the case's exceptional nature by clear and convincing evidence. *See Astoria Indus. of Iowa, Inc. v. Brand FX Body Co.*, No. 2-08-144-CV, 2010 WL 1433404, at *12–13 (Tex. App.—Fort Worth Apr. 8, 2010, pet. denied) (mem. op.). But the Fifth Circuit has since held that the Supreme Court's holding in *Octane Fitness* rejecting the clear-and-convincing-evidence standard and regarding the meaning of an "exceptional case" under the attorney's-fees provision in the Patent Act applies to the Lanham Act's attorney-fees provision. *See Baker*, 821 F.3d at 622–25. Similarly, the Fifth Circuit has also held that, consistent with the Supreme Court's holding in *Highmark Inc. v. Allcare Health Management System, Inc.*, 572 U.S. 559, 134 S. Ct. 1744 (2014), a trial court's fee determination under the Lanham Act is reviewed for an abuse of discretion. *All. for Good Gov't*, 919 F.3d at 295 (citing *Highmark*, 572 U.S. at 561, 134 S. Ct. at 1747). We thus apply an abuse-of-discretion standard of review. *See id.*

4

## II. Factual and Procedural Background

French-owned Hutchinson is the world's leading manufacturer of military-grade wheels, runflats,[3] and beadlocks.[4] Hutchinson owns the common-law trademark for the use of the word "Hutchinson" in connection with the manufacture and sale of its products in Texas and throughout the United States. Since at least 2005, Hutchinson has engraved or stamped every wheel, runflat, and beadlock that it sells with its trademark.

Hutchinson's products are used by various branches of the United States military, as well as other executive-branch departments and specialty-vehicle manufacturers. Once these products wear down or their shelf life expires, the U.S. government takes the products out of service and sells them as scrap. DBL Designs—a Tarrant County company and Hutchinson competitor—buys these discarded products from third parties, modifies them, and sells them to its customers. DBL marketed and sold these used, modified products as new Hutchinson products by (1) leaving Hutchinson's original trademark, serial number, DOT code,[5] and CAGE

---

[3]A runflat is a device in a tire's interior that, in the case of a flat tire, supports the vehicle's load and enables the vehicle to continue driving.

[4]A beadlock is a device that secures a tire to a wheel so that a low-pressure tire stays attached to the wheel.

[5]A DOT code is associated with the wheel's manufacturer and signifies that the wheel complies with Department of Transportation standards.

code[6] on the modified products and (2) telling its customers that it was selling them genuine, new, unmodified Hutchinson products. According to Hutchinson, DBL's modifications to Hutchinson products rendered them unsafe.

## A. *Hutchinson Sues DBL*

In May 2018, Hutchinson sued DBL for trademark dilution under the Texas Business and Commerce Code[7] and for common-law trademark infringement and unfair competition. Hutchinson would later amend its pleadings to drop its trademark-dilution claim and to add claims for false designation of origin under the common law and the Lanham Act; unfair competition under the Lanham Act; and common-law unjust enrichment.[8] According to Hutchinson, DBL was using Hutchinson's trademark to sell modified wheels, runflats, and beadlocks as genuine Hutchinson products. As a result of DBL's alleged misconduct and misrepresentations, Hutchinson claimed that DBL made money from customers who

---

[6]Hutchinson's CAGE code is a unique, government-assigned identification number that "allows the government or any NATO-friendly country to reference [Hutchinson] and [its] products."

[7]*See* Tex. Bus. & Com. Code Ann. § 16.103.

[8]Hutchinson states in its brief that its amended petition included a trademark-infringement claim under the Lanham Act. Hutchinson's amended petition does not appear to allege such a claim, but the trial court's judgment states that the jury found that DBL violated the Lanham Act by infringing and willfully infringing on Hutchinson's trademark. DBL does not complain on appeal that Hutchinson did not plead a Lanham Act infringement claim or that the trial court's judgment is unsupported by the pleadings.

would have otherwise purchased authentic Hutchinson products and harmed Hutchinson's reputation by selling unsafe, inferior products to customers without informing them that those products were not, in fact, authentic Hutchinson products.

In addition to damages and attorney's fees, Hutchinson sought temporary and permanent injunctive relief. In June 2018, the parties agreed to a temporary injunction prohibiting DBL from (1) directly or indirectly representing to consumers that DBL was using Hutchinson products; (2) submitting project bids to consumers representing that DBL was using Hutchinson products in the project; and (3) using number and letter combinations identifying or designating Hutchinson products on DBL's products, product lists, literature, catalogs, bids or bid applications, or "otherwise in connection with any of DBL's business activities."

**B.** *DBL's alleged bad-faith pretrial acts*

During discovery, Hutchinson served DBL with interrogatory and production requests seeking the identity of customers, persons, and entities to whom DBL had sold or provided wheels, runflats, and beadlocks bearing Hutchinson's trademark, along with documents related to those transactions. DBL objected to providing this information, claiming that its customer information, including its customer lists, was protected from disclosure by Rule 507's trade-secret privilege. *See* Tex. R. Evid. 507. Although Hutchinson offered to enter into a confidentiality order to protect this information, DBL stood by its assertion that its customer information was a trade secret and claimed that the information was not discoverable because it was not

necessary or essential to a fair adjudication of Hutchinson's claims. *See* Tex. R. Evid. 507(a). As a result of DBL's stance, Hutchinson moved to compel DBL to respond. After a hearing, the trial court granted Hutchinson's motion and ordered DBL to disclose (among other things), the identity of the customers to whom DBL had sold modified Hutchinson products from January 1, 2014, to the present, along with documentation related to those transactions.

A bit over a year into the case, in late August 2019, DBL's lead counsel left the law firm, and another attorney in the firm took over the case. Around that time, Hutchinson asked to inspect DBL's inventory of wheels and other Hutchinson products. Hutchinson sent multiple emails over the course of a month asking DBL to make its inventory available to Hutchinson for inspection. DBL eventually agreed to an inspection but soon reversed course and opposed the inspection request, claiming that it did not possess any wheels that were relevant to Hutchinson's claims, even though (1) DBL's interrogatory responses confirmed that it possessed and was still modifying and selling used Hutchinson products and (2) DBL's president had testified in his deposition that DBL was still purchasing surplus Hutchinson products. As a result, Hutchinson moved to compel the inspection. But before the motion could be heard, DBL agreed to the inspection in early November 2019.

Meanwhile, on October 11, 2019—four days after the close of discovery, about seven weeks before the December 2, 2019 special trial setting, and on the pleading-amendment deadline—DBL counterclaimed. It alleged that Hutchinson had violated

8

the Texas Free Enterprise and Antitrust Act of 1983 and Section 15 of the Clayton Antitrust Act by (1) suing DBL to restrain its sales and to recover damages in an amount that, in reasonable probability, would force it out of business; (2) contracting and conspiring with third parties to have those parties stop purchasing Hutchinson products from DBL and to purchase those products only from Hutchinson; and (3) making false and misleading statements to DBL's customers and vendors with "the specific intent to get th[o]se third-parties to either stop selling or stop buying DBL." Hutchinson moved for summary judgment on no-evidence grounds and on its *Noerr-Pennington* doctrine[9] affirmative defense.

Hutchinson set its summary-judgment motion for hearing on November 21, 2019. Three days before DBL's summary-judgment-response deadline, DBL's counsel

---

[9]The *Noerr–Pennington* doctrine arose out of two U.S. Supreme Court cases: *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S. Ct. 523 (1961), and *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S. Ct. 1585 (1965). *See Robinson v. KTRK Television, Inc.*, No. 01-14-00880-CV, 2016 WL 1267990, at *3 n.12 (Tex. App.—Houston [1st Dist.] Mar. 31, 2016, pet. denied) (mem. op.). The doctrine has its roots in the First Amendment to the United States Constitution, which guarantees the "right of the people . . . to petition the government for a redress of grievances." *RRR Farms, Ltd. v. Am. Horse Prot. Ass'n, Inc.*, 957 S.W.2d 121, 126–27 (Tex. App.—Houston [14th Dist.] 1997, pet. denied) (quoting U.S. Const. amend. I). "The doctrine provides immunity from 'antitrust liability' to those who petition the government for redress and also bars claims based on conduct 'incidental' to the prosecution of a lawsuit respecting such redress." *Profinity, LLC v. One Techs., L.P.*, No. 05-14-00403-CV, 2015 WL 9257025, at *13 (Tex. App.—Dallas Dec. 17, 2015, no pet.) (mem. op.) (citing *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 934 (9th Cir. 2006); *Noell v. City of Carrollton*, 431 S.W.3d 682, 708 (Tex. App.—Dallas 2014, pet. denied)). A claim of immunity based on the *Noerr–Pennington* doctrine is an affirmative defense. *Id.* (citing *RRR Farms*, 957 S.W.2d at 129).

moved to continue the trial setting and to withdraw because DBL's attorney was new to the case and because DBL was not paying its legal fees. Hutchinson opposed the motions because the withdrawal motion was untimely under the trial court's rules and because granting the motions would prejudice Hutchinson, which had "committed resources to prosecuting this case through trial on the schedule set by the Court."

The trial court heard DBL's motions and Hutchinson's summary-judgment motion on November 21, 2019. At the hearing, DBL's counsel stated that he would continue as DBL's counsel. The trial court allowed DBL time to supplement its summary-judgment response and Hutchinson time to reply, denied the withdrawal motion as moot, and reset the trial to a preferential setting on March 2, 2020.

In mid-February 2020, the trial court granted Hutchinson's summary-judgment motion without stating the ground or grounds upon which it relied. The case proceeded to trial as scheduled.

## C. *Trial*

During the four-day trial in early March 2020, the jury heard testimony from Mark Young (Hutchinson's value-chain vice president); Joe Duffy (vice president of Hutchinson's Buffalo division[10]); Johan Resare (Hutchinson's technical director in charge of wheels and related systems); Jonathan "Hoot" Wade (Hutchinson's technical expert); Stuart Miller (Hutchinson's damages expert); Usman Bashir (owner

---

[10]The Hutchinson products at issue in this case were manufactured in Buffalo, New York, and Trenton, New Jersey.

of CSI Armoring, a former DBL customer); Jesse Marroquin (executive vice president of Skeeter Brush Trucks, another former DBL customer); Daniel Little (DBL's owner); and Rick Ivey (DBL's chief financial officer).

Little and several of Hutchinson's witnesses explained that around 2015, DBL began purchasing from various third-party suppliers used and surplus Hutchinson wheels, runflats, and beadlocks and modifying them. DBL sold these modified products to its customers and represented that they were new, genuine Hutchinson products (1) by leaving Hutchinson's name, DOT number, CAGE number, and serial number on them; (2) by providing Hutchinson's product certifications to customers; and (3) by affirmatively representing that the products were new. DBL's modifications, however, invalidated the DOT and Hutchinson certifications.

According to Hutchinson, DBL's modifications also compromised the structural integrity, performance, and safety of Hutchinson's products. Little, however, disagreed that DBL's modifications compromised the structural integrity of Hutchinson's wheels. And while some of DBL's modified Hutchinson products had quality-control issues and had failed, there were no accidents, injuries, or deaths resulting from those products.

Little claimed that he never thought that DBL's modifying Hutchinson's products and leaving Hutchinson's name and identifying information on the modified products would be a problem. He thought that even after DBL's modifications, Hutchinson's certifications and warranties still applied to the wheels but testified that

11

he now knows that DBL's modifications voided Hutchinson's certifications and warranties. And since the entry of the June 2018 agreed temporary injunction, DBL had milled Hutchinson's identifying information off of the products it had sold and had complied with the injunction's terms.

Since 2015, DBL had sold a total of 2,000 modified Hutchinson wheels to about 150 customers. Little admitted that Hutchinson had identified at least four of those customers who were confused by DBL's modified Hutchinson products. Two of those customers, Bashir and Marroquin, testified. Bashir—who had purchased Hutchinson wheels for years and whose company CSI Armoring has contracts with U.S. and foreign governments to provide military and law-enforcement vehicles— stated that Hutchinson "sets the industry standard" with its "premium" products. Bashir testified that he thought DBL was a Hutchinson distributor and that he was unaware that the wheels and runflats CSI Armoring was purchasing from DBL had been modified. Bashir thought that the wheels and runflats that he had purchased from DBL were new, unmodified wheels that DBL had purchased directly from Hutchinson (1) because the wheels were stamped with Hutchinson's name, DOT number, and part number, (2) because DBL had provided him with Hutchinson's certifications, and (3) because Little had told Bashir that the products were new. Based on his experience with DBL, Bashir opined that DBL was "piggybacking" on Hutchinson's name.

The wheels' authenticity was especially important with respect to CSI Armoring's contract with the U.S. government because that contract required that Hutchinson wheels be used and that CSI Armoring provide Hutchinson certifications to demonstrate the wheels' authenticity. When some of Bashir's customer's reported problems with the wheels, Bashir contacted Hutchinson directly. Bashir learned from Hutchinson that the products CSI Armoring had purchased from DBL were not new, genuine products. Bashir then had to inform CSI Armoring customers that the wheels it had sold to them were not genuine Hutchinson wheels.

Marroquin with Skeeter Brush Trucks (a manufacturer and upfitter of wildland fire trucks) similarly testified that DBL had made misrepresentations about the Hutchinson wheels that it was selling. According to Marroquin, DBL had represented to him that the wheels were "Hutchinson new old[-]stock wheels," meaning that the wheels had never been used. But unlike Bashir, Marroquin realized that DBL had modified the Hutchinson wheels he was purchasing, and he did not think that Hutchinson "stood behind" or warranted those wheels. But DBL had told Marroquin that the modified wheels were nevertheless still DOT compliant.

Marroquin later learned that DBL had modified the wheels far more than he had initially realized and that these modifications had negatively impacted the wheels' performance. He opined that while Hutchinson wheels were "[v]ery good quality," the wheels that DBL had sold to Skeeter were "[v]ery poor quality." About 10 percent of DBL's wheels did not pass Skeeter's quality inspection. But Skeeter caught these

13

quality-control issues before passing on the wheels to its clients, and there were no accidents or safety issues involving the modified Hutchinson products that Skeeter had sold to its customers.

Hutchinson's technical expert testified regarding DBL's modifications, which completely changed the structural integrity of Hutchinson's wheels and invalidated the DOT certifications. The expert was unaware of any injuries or accidents caused by DBL's modifications.

Although Hutchinson believed that DBL's infringement of Hutchinson's trademark had caused a profit loss of $758,000, its economic expert calculated between $182,000 and $576,000 in lost profits, depending on the jury's determination of how long the infringement had occurred. Regarding disgorgement, Hutchinson's expert calculated between $468,000 and $830,000 in disgorgement damages.

After hearing all the evidence, the jury found that (1) DBL both engaged in and willfully engaged in unfair competition by passing off its goods and services in a manner likely to confuse its potential customers and (2) DBL both infringed and willfully infringed on Hutchinson's trademark. But the jury did not award Hutchinson lost-profit damages on either claim and found that none of DBL's gross sales were attributable to its willfully engaging in unfair competition by passing off. The jury did, however, determine that $204,312 of DBL's gross sales were attributable to DBL's willful use of Hutchinson's trademark and that DBL's total costs and deductions with respect to those sales was $123,318. The jury's verdict on liability and damages was

not unanimous, but the jury unanimously declined to find that DBL had acted with gross negligence or malice.

**D.** *DBL's alleged bad-faith post-trial acts*

Shortly after the trial's conclusion, Hutchinson moved to designate the case as exceptional under the Lanham Act. *See* 15 U.S.C.A. § 1117(a). Hutchinson argued that the case was exceptional because of DBL's willful violations of the Lanham Act, Hutchinson's strong litigating position, and DBL's unreasonable pretrial litigation conduct.

While Hutchinson's motion was pending, Little received an email in late July 2020 that appeared to be from an acquaintance forwarding him an email chain. This chain of emails—some of which were in French—appeared to be sent among four Hutchinson employees planning a meeting at DBL's facility on August 2, 2020, with a Hutchinson informant working for DBL. DBL reported this information to the Federal Bureau of Investigation, but ultimately, no one appeared for the meeting at the scheduled time.[11]

Over two weeks later, DBL's attorney alerted Hutchinson's attorneys to the email chain's existence because DBL planned to move for death-penalty sanctions

---

[11]DBL's attorney and the attorney's paralegal contacted the FBI on DBL's behalf. The FBI advised them that no one should be present at DBL's facility the day of the planned meeting but that surveillance cameras should be installed. DBL obtained additional surveillance cameras for the facility, but "[s]urveillance of the property on August 2, 2020[,] did not show anyone coming to or into DBL's facility."

based on the email chain. Hutchinson's attorney encouraged DBL's attorney not to file the motion as planned and to "instead focus on confirming the authenticity of this email, which to me does not appear to be what you claim it is." But DBL filed the motion that day so that it could be heard with Hutchinson's exceptional-case-designation motion, which was already set for hearing.

In its sanctions motion, DBL contended that Hutchinson's (ostensibly) hiring an informant to work at DBL was a violation of the Economic Espionage Act. *See* 18 U.S.C.A. § 1831 (criminalizing misappropriation and theft of trade secrets with the knowledge or intent that the offense will benefit a foreign government, instrumentality, or agent). DBL demanded that Hutchinson identify its informant and argued that "at best," Hutchinson was "attempting to conduct some kind of unauthorized post-verdict discovery in violation of Texas Rule[ ] of Civil Procedure 215[.3] to continue pursuing [DBL] until it is completely out of business." *See* Tex. R. Civ. P. 215.3. Based on this alleged discovery abuse, DBL asked the court to dismiss Hutchinson's claims with prejudice and to award DBL $10,000 in attorney's fees. *See* Tex. R. Civ. P. 215.2(b)(5), (8), 215.3. DBL alternatively asked the trial court to order Hutchinson to retain a private forensic investigator to determine the emails' origins.

Hutchinson responded that the email chain was "an obvious fake," pointing out that the domain names of the email addresses in the chain—@hutchisoninc.com and @hutchison.fr—misspelled Hutchinson because they were missing a letter "n"

16

and that Hutchinson's email domain name is @hutchinsoninc.com.[12] Hutchinson also pointed out that the email addresses in the chain used the naming convention FirstName.LastName@hutchison.com, instead of using Hutchinson's actual email naming convention, FirstInitialLastName@hutchinson.com. Additionally, one email-chain participant's first name was misspelled in the email address's username and that person no longer worked with Hutchinson; two of the participants had not worked at the company since 2016; and the participant who purportedly drafted one of the emails in French—Resare—does not speak or write in that language[13] and does not go by "Lars," as he was referred to in the email chain and within the email address's username.[14]

Hutchinson argued that because the email chain was clearly bogus, it should be disregarded and urged the trial court to deny DBL's sanctions motion. Hutchinson also characterized DBL's sanctions motion as another "unreasonable and dubious" delay tactic because DBL had waited until the day it filed its sanctions motion to notify Hutchinson about the email chain. Hutchinson contended that DBL's failing to

---

[12]According to Hutchinson's motion, the domain name "Hutchisoninc.com" belongs to Hutchison Sealing and Asphalt, Inc., a company in North Carolina, and the domain name "Hutchison.fr" is an invalid domain name.

[13]Resare testified at trial that he is originally from Sweden.

[14]At least one of the emails admitted into evidence at trial reveals that Resare goes by "Johan" and that his email address is jresare@hutchinson.com, not lars.resare@hutchison.fr as reflected in the email chain.

give Hutchinson the opportunity to confirm the email chain's authenticity before DBL filed its sanctions motion was an attempt to defraud the trial court and thus further supported Hutchinson's argument that the case was extraordinary under the Lanham Act. Hutchinson asked the trial court to order DBL to pay for an investigation to determine the email chain's origins to enable the trial court to render appropriate sanctions at a later date.

In mid-August 2020, the trial court heard Hutchinson's exceptional-case-designation motion and DBL's sanctions motion together.[15] The trial court denied the former, continued the latter, and instructed the parties to conduct a forensic investigation to determine the email chain's origin. Over the next several months, the parties squabbled over the email chain's origin (Hutchinson claimed that DBL had fabricated it, while DBL maintained that it had not and that Hutchinson was behind the email chain) and over the details and scope of the investigation, with both parties moving to compel court-ordered procedures for forensic evaluation. DBL retained a digital-forensics company, which performed an initial forensic analysis to determine the email chain's origin, but the parties' disagreement regarding the investigation's next steps prevented the investigation from moving forward. In early December 2020, DBL withdrew its sanctions motion but requested its attorney's fees and

---

[15]The record does not include the transcript from this or any other post-trial hearing.

18

reimbursement for the forensic-analysis costs. During a status conference a few days later, however, the trial court instructed the parties to continue the investigation.

The parties continued the investigation but to no avail. In late June 2021, Hutchinson moved for sanctions and for reconsideration of the trial court's exceptional-case-designation ruling in light of DBL's post-trial conduct. According to Hutchinson's motion, "[a]fter ten months, the origin and provenance of the Fake Email remains as it did then: DBL is solely responsible for the Fake Email, its lawyers are responsible for submitting it to the [c]ourt, and . . . the Fake Email's origin remains likely DBL itself." The motion claimed that since the "fake email" came to light, DBL had continued to "obstruct Hutchinson's efforts to gain clarity on how DBL came to submit [the] overtly Fake Email" to the trial court, and that "[d]espite DBL's obstructionism, Hutchinson's investigation confirm[ed]" that (1) Little and DBL either destroyed or withheld evidence that the trial court ordered produced and (2) Little and DBL "are almost certainly behind the [fake email's] creation and use." Shortly after Hutchinson moved for sanctions and for reconsideration, it once again moved the trial court to reconsider its exceptional-case-designation ruling, this time in light of the Fifth Circuit's then-recent ruling in *Spectrum Association Management. See* 5 F.4th at 566–67.

While the parties litigated the sanctions and exceptional-case-designation issues, Hutchinson also sought permanent injunctive relief, which DBL largely did not oppose. In September 2020, the trial court permanently enjoined DBL from

- directly or indirectly representing to any consumer that it is using Hutchinson products;

- submitting any bids for projects with any consumer while representing that DBL is using Hutchinson products in the project;

- using specific number and letter combinations identifying or designating Hutchinson products on its product lists, literature, catalogs, bids, or bid applications, or otherwise in connection with any of DBL's business activities; and

- claiming that any used product originally manufactured by Hutchinson is new or unused.

The trial court further ordered DBL to include a permanent 50-by-35-millimeter prominent warning on every wheel, runflat, or beadlock originally manufactured by Hutchinson that DBL remanufactures and markets or sells to any third party stating: "This is a remanufactured product. Any certifications, specifications, or warranties that may have applied to this product prior to its modification by DBL Design[s], LLC are not applicable."

Almost a year later, in August 2021, Hutchinson and DBL attended FDIC International, a large fire-and-rescue trade show. At that event, Hutchinson's Applications Engineering Manager saw two display vehicles with DBL wheels. According to him,

> On the rear wheels of both display vehicles, there was a sticker on the brake side of the inner flat base of the wheel displaying the text "This is a remanufactured product. Any certifications, specifications, or warranties that may have applied to this product prior to its modification by DBL Designs, LLC are not applicable." These stickers were not permanent, nor were they prominently displayed.

The manager further observed that there was no sticker on the front wheels and that the front wheels were not marked with "any disclaimer related to the remanufactured nature of DBL's wheels."

Based on the manager's observations (which were contained in a sworn declaration supported by photographs of the wheels), Hutchinson moved to hold DBL in contempt. Hutchinson argued that DBL had violated the permanent injunction by failing to permanently mark its wheels with the court-ordered disclaimer because (1) neither of the front wheels was marked and (2) DBL "knew that its sticker [on the back wheels] did not comply with the Permanent Injunction because Hutchinson [had] already rejected [DBL's] request to use the sticker instead of permanently marking its wheels with the disclaimer." Hutchinson also urged the trial court to revisit its exceptional-case-designation ruling based on DBL's alleged permanent-injunction violations.

In response, DBL argued that the Hutchinson manager's statement regarding the stickers' lack of permanency was conclusory and that regarding the front wheels, the manager did not aver that he had "observed both sides of the front wheels" or take photographs of the inside of those wheels. Little testified in his affidavit that DBL's disclosure stickers are "permanent once applied" and that according to the stickers' technical datasheet, the adhesive is "solvent-based, permanent with high initial tack and final adhesion." Little further testified that "[e]ach DBL wheel is shipped to DBL's customers with the [d]isclosure [s]ticker prominently displayed on

21

the wheel." He explained that "DBL wheels may be installed with either side of the wheel facing the exterior of the vehicle. After a customer receives the wheel, it is possible that they install the wheel such that the [d]isclosure [s]ticker is facing the vehicle." According to Little, he personally observed disclosure stickers on all the DBL wheels on the display vehicles at FDIC International: "The rear wheels of both display vehicles at the tradeshow were oriented such that the [d]isclosure [s]tickers were observable from the exterior of the vehicle. The front wheels of both display vehicles were oriented such that the [d]isclosure [s]tickers were facing the interior of the vehicle."

The trial court heard the contempt motion in late October 2021, but it did not rule on it at that time.[16] Instead, the trial court ordered DBL to produce within 28 days records regarding all the wheels it had sold since the September 2020 permanent injunction, as well as any documents establishing whether and how each wheel was marked in accordance with the injunction. The trial court also denied Hutchinson's sanctions motion, as well as Hutchinson's request that the trial court reconsider is exceptional-case-designation ruling.

Shortly thereafter, the trial court signed a final judgment on the jury's verdict, awarding Hutchinson $80,994 in profit-disgorgement damages based on the jury's

---

[16]Hutchinson's contempt motion remains outstanding.

finding that DBL had willfully infringed on Hutchinson's trademark, along with pre- and post-judgment interest.

Hutchinson timely appealed and attacks only the trial court's failure to find that this was an exceptional case under the Lanham Act.

### III. Analysis

Hutchinson argues in its sole issue that the trial court abused its discretion by failing to find that this case is exceptional under the Lanham Act because (1) DBL willfully violated multiple provisions of the Lanham Act "2,000 times"; (2) Hutchinson's case "stood out" because of the "sheer strength" of Hutchinson's litigating position; and (3) DBL defended its case in an unreasonable manner. Hutchinson additionally argues that the trial court's ruling must be reversed in light of the Fifth Circuit's holding in *Spectrum Association Management*. *See id.* We address each of these contentions in turn.

### A. *The jury's willfulness findings*

The non-unanimous jury found that DBL willfully—which the charge defined as "voluntarily with the intent to confuse or deceive potential purchasers"—infringed on Hutchinson's trademark and engaged in unfair competition by passing off DBL's goods or services. Based on these findings and the evidence that DBL had sold 2,000 modified wheels, Hutchinson asserts that the jury found that DBL willfully "violated two separate provisions of the Lanham Act thousands of times" and thus

23

argues that based on the jury's willfulness findings alone, the trial court abused its discretion by not finding this case exceptional.

Exceptional cases include those in which the defendant "maliciously, fraudulently, deliberately, or willfully infringes [on] the plaintiff's mark." *Spectrum Ass'n Mgmt.*, 5 F.4th at 566–67 (quoting *Procter & Gamble Co. v. Amway Corp.*, 280 F.3d 519, 527 (5th Cir. 2002)); *Astoria*, 2010 WL 1433404, at *13 ("Exceptional cases include when the defendant's violation of the Lanham Act is malicious, fraudulent, deliberate, or willful."); *cf. Savage Tavern, Inc. v. Signature Stag, LLC*, No. 5:21-CV-078-H, 2022 WL 1471442, at *6 (N.D. Tex. May 10, 2022) ("A prevailing party . . . need not show bad faith, malice, or fraud—an exceptionally weak claim or defense by the opposing party can suffice, as can vexatious or inexplicable litigation conduct." (citing *All. for Good Gov't*, 919 F.3d at 295–96)). In such cases, "[t]he prevailing party must further demonstrate 'a high degree of culpability on the part of the infringer,' such as bad faith." *Spectrum Ass'n Mgmt.*, 5 F.4th at 567 (quoting *Tex. Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc.*, 951 F.2d 684, 697 (5th Cir. 1992)).

Here, Hutchinson urges that the jury's willfulness findings alone compel an exceptional-case finding. An intentional-infringement finding—that is, that the infringer acted willfully—can establish an exceptional case under the Lanham Act. *See Philip Morris USA Inc. v. Lee*, 547 F. Supp. 2d 685, 697–98 (W.D. Tex. 2008) (citing *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1127 (5th Cir. 1991)). But a willful-infringement finding "does not bind the trial court in determining whether

24

[the] case is 'exceptional.'" *Tex. Pig Stands*, 951 F.2d at 697 (footnote omitted); *see Philip Morris USA*, 547 F. Supp. 2d at 697–98 ("[A] finding of willfulness for the purpose of awarding statutory damages does not bind a court in determining whether or not a case is exceptional."); *see also Lowe v. Eltan, B.V.*, No. 9:05-CV-38, 2018 WL 7822940, at *10 (E.D. Tex. Dec. 12, 2018) ("A finding of willfulness on the defendant's part does not automatically make it an exceptional case, but it can inform the court in its determination."), *report and recommendation adopted in part*, No. 9:05-CV-38, 2019 WL 493806 (E.D. Tex. Feb. 8, 2019); *Xpel Techs. Corp. v. Carlas Int'l Auto. Accessory, Ltd.*, No. SA-16-CA-01308-DAE, 2017 WL 9362801, at *8 (W.D. Tex. Nov. 27, 2017) ("A finding of intentional infringement—that the infringer acted willfully— may establish an exceptional case for purposes of § 1117(a). However, a finding of willfulness for the purpose of awarding statutory damages does not *per se* establish that the case is exceptional." (citations omitted)), *report and recommendation adopted*, No. 5:16-CV-1308-DAE, 2017 WL 9362565 (W.D. Tex. Dec. 19, 2017).

Because a willful-infringement finding in and of itself does not require a trial court to find that a case is exceptional, we conclude that the trial court did not abuse its discretion by failing to find this case exceptional on that basis alone.

**B.** *The strength of Hutchinson's litigating position*

Hutchinson next argues that its case is exceptional because of the sheer strength of its litigating position.

25

As noted, a trial court may declare a case exceptional when "in considering both governing law and the facts of the case, the case stands out from others with respect to the substantive strength of a party's litigation position." *Baker*, 821 F.3d at 625. Here, Hutchinson compares its litigation position to the prevailing party in *Alliance for Good Government. See* 919 F.3d at 296. In that case, the Fifth Circuit held that the trial court did not abuse its discretion in concluding that Alliance's case stood out because of the strength of its infringement claim against Coalition:

> The district court first found that the case stood out due to the strength of Alliance's litigating position: Alliance adopted its logo at least 15 years before Coalition began using its similar logo; Alliance's composite mark was strong; the marks were very similar; and both parties provided the same "product," used the same advertising channels, and targeted the same "customers." In sum, "[t]he likelihood of confusion [was] so great that it would appear that customer confusion was Coalition's motivation for adopting the Coalition Mark." Further, Coalition presented meritless defenses at the summary judgment stage: a laches argument that was not supported by "any credible evidence," as well as the bare assertion that the composite marks were different because one depicted an eagle while the other depicted a hawk.

*Id.* (alterations in original).

Hutchinson claims that its litigation position was at least as strong as Alliance's because Hutchinson had used its trademark on all its goods since at least 2005; the Hutchinson name evokes quality and "sets the industry standard" when it comes to wheels, runflats, and beadlocks; DBL competes with Hutchinson; and DBL piggybacked on Hutchinson's name and deliberately left Hutchinson's trademark and other identifying information on the modified products even after it knew that its

26

customers were confused. Alliance, however, prevailed on its trademark-infringement claim by summary judgment, which required Alliance to prove that it was entitled to judgment as a legal matter. *See generally All. for Good Gov't v. Coal. for Better Gov't*, 901 F.3d 498 (5th Cir. 2018). Hutchinson, on the other hand, tried its case to a jury, which did not unanimously find in its favor, awarded no lost-profit damages for either of Hutchinson's claims, and awarded only a fraction of the disgorgement damages that Hutchinson was seeking. The jury trial also gave the trial court the opportunity to observe the witnesses' testimony, candor, and demeanor. We are thus unpersuaded that the trial court—in a case-by-case exercise of its discretion, considering the totality of the circumstances—abused its discretion by not concluding that this case stood out due to the strength of Hutchinson's litigation position.

## C. *DBL's manner in defending its case*

A trial court can also deem a case exceptional if the unsuccessful party has litigated the case in an unreasonable manner. *Baker*, 821 F.3d at 625; *see All. for Good Gov't*, 919 F.3d at 296 (affirming trial court's determination that defendant litigated the case unreasonably by filing an unsupported laches defense, filing a "counterclaim without any actionable conduct," filing a meritless dismissal motion that was mooted by a summary-judgment motion filed two weeks later, and behaving unreasonably during discovery by refusing to postpone depositions). Hutchinson argues that DBL unreasonably defended the case (1) by refusing to respond to written discovery requests seeking the identities of customers to whom DBL had sold modified

27

Hutchinson products; (2) by refusing to allow Hutchinson to inspect DBL's inventory of wheels and Hutchinson products at DBL's facility; (3) by filing untimely, frivolous antitrust counterclaims; (4) by attempting to use fake evidence to obtain post-verdict death penalty sanctions; and (5) by violating the permanent injunction.[17] We have reviewed the record and are unconvinced that the trial court abused its discretion by not concluding that DBL litigated this case in an unreasonable manner.

Regarding DBL's refusal to respond to written discovery, Hutchinson argues that DBL's asserting the trade-secret privilege in response to Hutchinson's discovery requests regarding DBL's customers' identities was done in bad faith and forced Hutchinson to file a motion to compel. Although Hutchinson now describes DBL's refusal to "provide basic discovery" as a bad-faith pretrial act, DBL had a different take on Hutchinson's situation at the time. Soon after the trial court ruled on Hutchinson's motion to compel, Hutchinson filed an agreed motion for continuance (the parties' third agreed continuance motion) seeking to postpone the trial "because the nature of the claims at issue in the case, coupled with good[-]faith discovery disputes (over whether the identity of customers and sales data would be discoverable)," had substantially delayed discovery. Hutchinson went on to describe

---

[17]Hutchinson also points to DBL's attempts to interfere with routine third-party discovery as an additional way in which DBL unreasonably defended this case. Hutchinson did not raise this argument in the trial court, so we do not consider it in our analysis.

DBL's actions as "good-faith opposition" to Hutchinson's discovery requests that required court intervention.

As to the inspection, Hutchinson complains that it was forced to move to compel the inspection and that at the inspection, DBL refused to let Hutchinson inside its facility to view DBL's machines and disassembled Hutchinson products.[18] But Hutchinson never served DBL with a request for entry under Texas Rule of Civil Procedure 196.7 stating "the time, place, manner, conditions, and scope of the inspection" and specifically describing "any desired means, manner, and procedure for testing or sampling, and the person or persons by whom the inspection, testing, or sampling is to be made." *See* Tex. R. Civ. P. 196.7(a)(1) (providing that a party can gain entry on land or property of another party to inspect an object thereon by timely serving a request), (b) (outlining required contents of request for entry). Without such a request, the trial court could have concluded that DBL's actions were reasonable.

Nor can we conclude that DBL acted unreasonably in filing its antitrust counterclaims. Hutchinson first complains that "[t]he very act of filing such explosive claims six weeks ahead of a preferential trial setting is, by itself, unreasonable,

---

[18]At the inspection, DBL made its inventory of wheels and Hutchinson products available for inspection in the yard behind DBL's manufacturing facility. Hutchinson complains that DBL would not allow Hutchinson inside the facility to view disassembled Hutchinson products and the machines or the process DBL used to modify Hutchinson products. Hutchinson further complains that DBL was lying about its inventory because "[s]itting outside DBL's facility, Hutchinson encountered stacked pallets of shrink-wrapped used Hutchinson wheels DBL was about to modify."

inexplicable, and inappropriate." While DBL's timing may have been inconvenient for Hutchinson, DBL's filing was nevertheless timely because DBL filed its counterclaims on the pleading-amendment deadline set out in the parties' *agreed* scheduling order. Hutchinson further complains that DBL's antitrust counterclaims were boilerplate and baseless. DBL's pleadings, however, satisfy Texas's fair-notice-pleading standard, *see* Tex. R. Civ. P. 45, 47, and although Hutchinson made short work of DBL's antitrust counterclaims in its summary-judgment motion, we cannot say that those claims were objectively baseless, as Hutchinson contends.

We reach similar conclusions regarding DBL's post-trial behavior. *See Spectrum Ass'n Mgmt.*, 5 F.4th at 567 (considering defendant's post-trial misconduct in reviewing trial court's failure to find case exceptional). Regarding the email-chain issue, Hutchinson asserts that DBL failed to make a reasonable inquiry "to confirm the fake email's authenticity before it accused Hutchinson of a federal crime and sought to dismiss *all* of Hutchinson's claims in a public pleading."[19] *Cf.* Tex. R. Civ. P. 13. But after Hutchinson responded to the sanctions motion by pointing out several aspects of the email chain that cast doubt on the chain's authenticity, DBL responded

---

[19]Hutchinson states in its brief that "DBL's 'mistake' is all the worse because Hutchinson told DBL the email was fake and DBL filed . . . its ludicrous post-trial motion anyway without conducting any additional diligence." But Hutchinson's attorney did not tell DBL's attorney that the email was fake; he recommended further investigation: "I would encourage you to not file a motion for sanctions and instead focus on confirming the authenticity of this email, which to me does not appear to be what you claim it is."

with affidavits from Little, DBL's attorney, and that attorney's paralegal detailing Little's receipt of the email chain and the efforts made to determine the chain's authenticity before the sanctions motion was filed. The trial court was apparently concerned about the email chain's origin because it deferred ruling on the parties' sanctions requests to allow the parties time to conduct a forensic investigation into the emails' origins. The parties argued over the investigation's scope, and DBL withdrew its motion in early December 2020. But the parties continued to fight over the investigation, and in June 2021, Hutchinson moved for sanctions against DBL based on DBL's allegedly creating the email chain and obstructing the investigation. The trial court eventually denied the motion, which suggests that the trial court was unconvinced that DBL's actions were undertaken in bad faith.

Turning to Hutchinson's complaints regarding DBL's alleged violations of the permanent injunction, our record has no ruling on Hutchinson's contempt motion. Moreover, based on Hutchinson's contempt motion and DBL's response, it does not appear to us that DBL has violated the permanent injunction.

Our task is to determine whether the trial court abused its discretion by acting arbitrarily or unreasonably. Although the litigation was contentious at times, we are unable to conclude that DBL's litigation conduct was objectively unreasonable or that it was motivated by bad faith or was frivolous. We will not second guess the trial court's case-by-case exercise of its discretion, considering the totality of the

circumstances. The trial court thus did not abuse its discretion by not finding that DBL litigated the case in an unreasonable manner.

**D.** *The Fifth Circuit's Holding in* **Spectrum Association Management**

Lastly, Hutchinson argues that the trial court's ruling "cannot be squared with *Spectrum*, and thus must be reversed" and that "[f]ailing to do so puts [our] jurisprudence in conflict with the Fifth Circuit's interpretation of the Lanham Act." In *Spectrum*, the Fifth Circuit concluded that the trial court abused its discretion by declining to award attorney's fees to Spectrum, a trademark holder that had successfully sued a former employee (Tuttle) and his company (Lifetime) under the Anti-Cybersquatting Consumer Protection Act section of the Lanham Act for using an infringing website domain name that forwarded users to Lifetime's marketing website. *See* 5 F.4th at 562–63.

After a bench trial, the trial court awarded Spectrum the maximum amount of statutory damages and permanently enjoined Lifetime and Tuttle (collectively, the Lifetime Defendants) from infringing on Spectrum's trademarks. *Id.* at 563, 565–66. The Fifth Circuit determined that the trial court's damages award was not error because of the Lifetime Defendants' willful and bad-faith behavior:

> the record confirms that the Lifetime Defendants violated Spectrum's trademarks willfully and in bad faith by engaging in the following conduct: establishing Lifetime as Spectrum's competitor while Tuttle was under his non-compete agreement with Spectrum; registering the Infringing Domain with prior knowledge of Spectrum's trademarks; purchasing the Infringing Domain in the hopes of eventually selling it to Spectrum for a profit; and setting up the Infringing Domain to confuse

32

and divert internet users who sought Spectrum's services. The Lifetime Defendants demonstrated further willfulness during the underlying lawsuit by showing a disregard for their submission of inconsistent, misleading, and inaccurate answers to written discovery. Additionally, the Lifetime Defendants' bad-faith conduct continued after trial, when they blatantly copied text from Spectrum's copyright-protected web pages for use on Lifetime's website. Finally, there is no record evidence that the Lifetime Defendants offered to transfer the Infringing Domain to Spectrum.

*Id.* at 566.

But despite the Lifetime Defendants' behavior, the trial court declined to award Spectrum its attorney's fees. *Id.* at 563. The Fifth Circuit concluded that this failure was an abuse of discretion because the case was exceptional based on the Lifetime Defendants' behavior:

As discussed above, the record of this case confirms that the Lifetime Defendants engaged in willful, bad-faith infringement of Spectrum's trademarks, justifying an award of maximum statutory damages. The overwhelming evidence against the Lifetime Defendants illustrates the sheer strength of Spectrum's litigation position. Moreover, the Lifetime Defendants' disregard for their submission of inconsistent, misleading, and inaccurate answers to written discovery—including not admitting Spectrum was a competitor, failing to identify the clients they obtained from Spectrum, and misrepresenting that they had conducted a diligent search of the number of times the Infringing Domain was accessed— demonstrates that they litigated this case in an unreasonable manner.

*Id.* at 567. The court went on to explain that the Lifetime Defendants had acted in bad faith by registering and using an infringing internet domain with the intent to divert a direct competitor's potential customers to Lifetime's website; by never offering to transfer the Infringing Domain to Spectrum; and by engaging in post-trial misconduct by blatantly copying text from Spectrum's website. *Id.*

33

While the jury here ultimately found that DBL willfully violated the Lanham Act by infringing on Hutchinson's trademark and by passing off DBL's products, neither its actions giving rise to this suit nor its litigation behavior were as egregious as the defendants' behavior in *Spectrum*.

## IV. Conclusion

Given the trial court's broad discretion in determining whether a case is exceptional and the deference that we must give that ruling, we conclude that the trial court did not abuse its discretion by denying Hutchinson's request to deem this case exceptional. We thus overrule Hutchinson's only issue, and we affirm the trial court's judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: September 29, 2022